**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

NO. 5:10-CR-340-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| vs. | ) | **<u>MEMORANDUM AND</u>** |
| | ) | **<u>RECOMMENDATION</u>** |
| JAMES NORRIS WRIGHT, | ) | |
| | ) | |
| | ) | |
| ________________________________ | ) | |

This cause comes before the Court upon Defendant's motion to suppress, in which he seeks the suppression of all evidence and statements obtained from him on June 8, 2010. (DE-21). The Government responded to this motion (DE-24), and a hearing was conducted on January 11, 2012. (DE's-29-31). Both parties filed supplemental memoranda after the hearing. (DE's-32-33). Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation.

Ultimately, the disposition of Defendant's motion to suppress hinges on a single issue: whether the protective search of the center console of the vehicle in which Defendant was a passenger was supported by a reasonable suspicion that the occupants were dangerous. Arizona v. Johnson, 555 U.S. 323, 327 (2009). *See also*, United States v. Powell, 2011 WL 5517347, * 3 (4th Cir. 2011). For the following reasons, the undersigned finds that it was not and therefore RECOMMENDS that Defendant's motion

to suppress (DE-21) be GRANTED.

**I. Background**

Defendant is charged in a two count indictment with: 1) possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1); and 2) possession of a stolen firearm in violation of 18 U.S.C. § 922(j). (DE-1).

Officer Charles Cochran of the Fayetteville Police Department ("FPD") testified that on June 8, 2010 at approximately 1:00 p.m. he was patrolling the "Massey Hill area in Fayetteville", which is a high crime neighborhood. (Tr. 11-12, 60). He was working with Officer Brian Wollard, who was in a separate car. On previous occasions, Officer Cochran executed several search and arrest warrants in this area. *Id.* at 12-13. He specifically recalled executing a search warrant relating to crack cocaine at 1919 Powell Street, which is located in Massey Hill. *Id.* at 11-13. One search warrant executed at 1919 Powell Street involved Charles McCrae, who Officer Cochran testified was "known for assaulting police officers." *Id.* at 14, 26. However, Officer Cochran was not certain Charles McCrae still lived at the residence, nor was he looking for Mr. McCrae on June 8, 2010. *Id.* at 31.

At the time of his patrol, Officer Cochran was in uniform and driving an unmarked vehicle. *Id.* at 14. Officer Wollard, who was about 100 yards ahead of Officer Cochran, turned from Cude Street onto Powell Street. *Id.* at 16, 62. He instructed Officer Cochran to observe a vehicle near 1919 Powell Street, and then turned onto Craven Street. *Id.* at 17, 22. Officer Wollard instructed Officer Cochran to do so because he "felt it was very

odd . . . a new vehicle, with a custom paint job, having a lawnmower sticking out in a high crime narcotic area with someone standing outside the vehicle near a narcotic residence . . ." *Id.* at 63. However, Officer Wollard did not personally observe a drug transaction. *Id.* at 70.

After receiving Officer Wollard's instruction, Officer Cochran turned onto Powell Street and slowly drove past the vehicle in question. *Id.* at 19. At this time, Defendant was outside the vehicle. *Id.* Specifically, Officer Cochran "saw [Defendant] in the general vicinity of the vehicle." *Id.* at 35. He then "lost him for just a small area of time and then saw him return to the vehicle." *Id.* Officer Cochran assumed Defendant walked from the vehicle to 1919 Powell Street and back, although he did not see this because his vision was obstructed. *Id.* He did not see Defendant exchange money with anyone in the vehicle. *Id.* at 40. Nor did he personally observe any other form of hand-to-hand drug purchase. *Id.* at 54.

A lawnmower and a weed eater were "hanging out of" the vehicle's open trunk. *Id.* at 20. This concerned Officer Cochran because he had "investigated multiple cases . . . where people commonly steal lawnmowers . . . [and] weed eaters . . . for the purpose of selling them . . . for narcotics." *Id.* For this reason, Officer Cochran believed "that there was the potential that there could have been a hand-to-hand buy or purchase of narcotics." *Id.* at 21. In addition, the vehicle had Maryland license plates. *Id.* at 20-21. This also "piqued [Officer Cochran's] interest" because the vehicle might not "belong in this neighborhood other than . . . for the purpose of buying narcotics . . ." *Id.* at 21.

Eventually, Defendant got in the back seat of the vehicle, which drove in reverse toward Officer Cochran's car. *Id.* at 22. Officer Cochran felt this was "unreasonable", because it would have been easier for the vehicle to drive forward and turn around. *Id.* at 22-23. Furthermore, the driver did not see Officer Cochran, and ultimately Officer Cochran " was forced to put [his] vehicle in reverse and go backwards" to avoid a collision. *Id.* Specifically, Officer Cochran "was forced all the way back actually on to Cude Street." *Id.* at 23. Based on these observations, Officer Cochran initiated a traffic stop because the driver violated, *inter alia*, a City of Fayetteville ordinance against improper backing. *Id.* at 24. *See also*, DE 25-1, (*citing* Fayetteville City Ordinance § 16-258). However, Officer Cochran essentially concedes that the traffic violation was a pretext for the stop. (Tr. 44-45). Ultimately, Officer Cochran believed that an illegal drug transaction was taking place. *Id.* at 43-45, 54. Indeed, in a later report, Officer Cochran wrote that the vehicle was "stopped . . . based on reasonable suspicion of narcotic activity." (DE-32-2, pg. 4). Officer Cochran also told Detective Shawn Collins of the FPD that the stop was pretextual. [1] (Tr. at 84).

As Officer Cochran approached the vehicle, he noticed the driver, Victor Jones, "doing something over . . . in the console area." (Tr. at 25). Specifically, Mr. Jones' "lower body . . . was targeting the center console." *Id.* at 26. Officer Cochran believed Mr. Jones "was reaching for the center console for a purpose." *Id.* At this point, Officer

1 This was confirmed by Detective Shawn Collins of the FPD in both his written report (DE-32-3, pg. 1), and his testimony: "[a]s explained to me by Officer Cochran, it was a pretextual stop . . .[h]e made the basis of the stop because he wanted to investigate narcotic activity." (Tr. 84.)

Cochran was within 10 feet of the vehicle. *Id.* at 53. Mr. Jones was instructed to put his hands on the steering wheel, and he did so within three seconds. *Id.* at 27. Nonetheless, Officer Cochran described his compliance as "reluctant[]." *Id.* After Officer Wollard arrived at the scene, Mr. Jones was ordered out of the car and frisked for weapons by Officer Cochran. *Id.* at 27. After searching Mr. Jones, Officer Cochran conducted a protective search of the passenger compartment of the vehicle. *Id.* at pg. 27-28. The front seat passenger and Defendant remained in the vehicle. *Id.* During this search, Officer Cochran opened the center console and "found a clear plastic baggie with what appeared to be marijuana." *Id.* at 29.

Thereafter, Officer Cochran and Officer Wollard conducted "[a] complete search of all three defendants as well as the vehicle based on probable cause." *Id.* at 29, 67. Prior to the complete search, Officer Wollard removed Defendant and the front seat passenger from the vehicle. *Id.* at 66-67. While doing so, he noticed that he had previously arrested the passenger for selling narcotics in the area. *Id.* at 66. During the search of the vehicle, Officer Cochran and Office Wollard discovered a handgun. *Id.* at 30, 68. Defendant admitted that the handgun was his. *Id.* at 31, 68. This was a spontaneous utterance and not in response to a question. *Id.* at 68-69.

## **II. Analysis**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he underlying command of the Fourth Amendment is always that

searches and seizures be reasonable." Wilson v. Arkansas, 514 U.S. 927, 931 (1995). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Any ulterior motive a police officer may have for making the traffic stop is irrelevant. *Id.* at 813. A traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). "In the context of traffic stops, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011). "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent" *Id.* (citation omitted). An officer making a traffic stop may order passengers to get out of the car pending completion of the stop. United States v. Hampton, 628 F.3d 654, 658 (4th Cir. 2010). This may be done "so as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Id.*

However, "[b]efore an officer can stop and frisk a citizen, she must have 'reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" United States v. Massenburg, 654 F.3d 480, 482 (4th Cir. 2011)(*citing* Reid v. Georgia, 448 U.S. 438, 440 (1980)). Likewise, "[t]o justify a patdown of the driver or a passenger during a traffic stop, . . . just as in the case of a pedestrian reasonably suspected

of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Johnson, 555 U.S. at 327. Finally, "to conduct a lawful protective search of a stopped vehicle . . . an officer must possess a reasonable belief of both (1) the suspect's dangerousness and (2) the possibility that the suspect might gain immediate control of any weapons inside the vehicle." United States v. Griffin, 589 F.3d 148, 153 (4th Cir. 2009)(*citing* United States v. Holmes, 376 F.3d 270, 276 (4th Cir. 2004).

"The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior . . . and it is measured by the totality of the circumstances." Powell, 2011 WL 5517347 at * 4 (citations omitted). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. 1, 27 (1968).

Recently, the Fourth Circuit has expressed "concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011). Therefore, "the Government must do more than simply label a behavior as 'suspicious' to make it so." *Id.* The undersigned will review the instant facts in light of these recent admonitions from the Fourth Circuit.

Here, the undersigned finds that the initial traffic stop was valid. Officer Cochran personally observed a traffic violation, and any ulterior motive he had for making the stop is irrelevant. Digiovanni, 650 F.3d at 506. However, the discovery of the evidence

Defendant now seeks to suppress began when Officer Cochran performed a protective search of the passenger compartment. Thus, as noted above, the issue becomes whether the protective search of the center console of the vehicle in which Defendant was a passenger was supported by a reasonable suspicion that the occupants were dangerous.

In support of its argument that there was reasonable suspicion to believe that the occupants of the vehicle were dangerous, the Government highlights the following facts: 1) the incident occurred in a high crime area, and indeed, near a residence where Officer Cochran had executed a narcotics related search warrant; 2) that the driver "reach[ed] toward the center console"; and 3) that the driver "hesitated for several seconds" before placing his hands on the steering wheel as instructed. (DE-33, pg. 4-5). These facts do not establish reasonable suspicion that the occupants of the vehicle were dangerous.

First, "an area's disposition toward criminal activity is an articulable fact . . . that may be considered along with more particularized factors to support a reasonable suspicion." United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997)(quotation omitted). However, in this case, this factor is tempered somewhat by the fact that this incident took place at 1:00 p.m. in the afternoon. *Cf.* Sprinkle, 106 F.3d at 617 (noting that an incident occurred "in a high crime area at 5:30 p.m. on a sunny day"). Moreover, this factor, standing alone, cannot establish reasonable suspicion. *Id.* *See also*, Illinois v. Wardlow, 528 U.S. 119, 124 (2000)("presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry"). Ultimately, the Government fails to support Defendant's presence in a high

crime area with other particularized factors sufficient to establish reasonable suspicion.

For example, Mr. Jones' reaching toward the center console establishes little. Officer Cochran's description of this activity was relatively vague, consisting of little more than an observation that he was reaching in that direction "for a purpose." (Tr. 26). He did not see any drugs, money, weapons, or drug paraphernalia, and he was approximately 10 feet away when he saw this movement. Once again, this activity is generic and susceptible to innocent explanation. *See*, Sprinkle, 106 F.3d 613, 617 (fact that suspects "huddled toward the center console with their hands close together" was insufficient to establish reasonable suspicion). Nonetheless, the undersigned will consider this an articulable fact, albeit one that adds relatively little to the reasonable suspicion calculus.

Next, the Government notes that Mr. Jones did not immediately comply with Officer Cochran's instruction to put his hands on the steering wheel. Officer Cochran initially testified that Mr. Jones' compliance was "reluctant[]." (Tr. 27). Later, when pressed, he testified "[s]lowly may have actually been --reluctantly probably tries to get in his mind too much, but certainly slowly was probably maybe a better word." *Id.* at 53. His actual testimony was that Mr. Jones complied within three seconds. *Id.* at 27. The undersigned would not describe this as either reluctant or slow. When given an opportunity to elaborate on the reluctance or slowness of Mr. Jones' compliance, Officer Cochran added little to his initial testimony. *Id.* at 52-53. Thus, the undersigned finds that Mr. Jones' compliance was neither "reluctant" nor "slow." Therefore, this factor does not support a finding of reasonable suspicion.

Finally, in its initial response the Government noted the presence of the lawnmower and weed eater in the vehicle's trunk, arguing that "it is not uncommon for drug users to trade stolen lawn equipment for drugs." (DE-24, pg. 7). This argument is abandoned in the Government's supplemental memorandum. (DE-33). Regardless, this "factor" is an illustration of the Government "using whatever facts are present, no matter how innocent, as indicia of suspicious activity." Foster, 634 F.3d at 248. Indeed, Officer Cochran conceded in his testimony that had he seen "any number of things" in the trunk, it would have "piqued his interest [in] the same way." (Tr. 51-52). As with the other factors, this observation adds little to the determination of whether reasonable suspicion existed.

In short, the none of the factors cited by the Government support a finding of reasonable suspicion individually. Likewise, these factors gain little, if any, strength when considered in combination. Officer Cochran's suspicion of drug activity was the lens through which he viewed Defendant's activity and it colored his perception of events. Therefore, the undersigned finds that Officer Cochran's search of the vehicle's center console was unreasonable, and the alleged marijuana discovered during that search must be suppressed.

Having determined that the search of the center console was unreasonable, the undersigned must now determine whether the discovery of the handgun and Defendant's statement regarding the handgun must be suppressed. Generally, courts will also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." *See*, Wong Sun v. United States, 371 U.S. 471, 488 (1963). The critical inquiry is

"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. In Brown v. Illinois, the Supreme Court articulated three factors that are used to determine whether the taint from an illegal search has dissipated: (1) the time between the Fourth Amendment violation and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct. Brown, 422 U.S. 590, 603–604 (1975). Here, the discovery of the evidence occurred almost immediately after the original unreasonable search, and there were no intervening circumstances to dissipate the taint of that search. Although Officer Cochran's violation was not particularly flagrant, that factor—under these circumstances—is outweighed by the previous two.

## **III. Conclusion**

For the aforementioned reasons, the undersigned RECOMMENDS that Defendant's motion to suppress (DE-21) be GRANTED in all respects. Specifically, it is RECOMMENDED that all evidence and statements obtained during the traffic stop conducted on June 8, 2010 be suppressed.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Thursday, January 19, 2012.

WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE